Filed 6/8/15  P. v. Villesca CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D066700 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. FSB1104585) |
| BENITO VILLESCA, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of San Bernardino County, William Jefferson Powell IV, Judge.  Affirmed in part and reversed in part with directions.

Raymond M. DiGuiseppe, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Julie L. Garland, Assistant Attorney General, Randall D. Einhorn and Peter Quon, Jr., Deputy Attorneys General, for Plaintiff and Respondent.

Defendant and appellant Benito Villesca was convicted of 25 counts related to the sexual molestation of his daughter, Jane Doe, who was a minor at all pertinent times, and one count of illegal possession of a firearm by a felon. Defendant was sentenced to an aggregate prison term of 300 years to life, plus 156 years eight months. He appeals, arguing: (1) his counsel should have sought dismissal of one of the four counts related to acts of oral copulation upon a minor because the evidence presented at his preliminary hearing did not support a fourth charge, and, in any event, the people failed to produce substantial evidence at the trial that defendant orally copulated his daughter no less than four times; (2) testimony from a forensic pediatrician, stating that her colleagues concurred in her findings of evidence of sexual assault by vaginal penetration, violated his federal Sixth Amendment right to confront testimonial witnesses, was inadmissible hearsay and was prejudicial; and (3) two counts against him arise from a single incident of molestation and sentencing on one of the counts should have been stayed under Penal Code[1] section 654.

As we explain, we agree with defendant that his counsel should have sought dismissal of one count of oral copulation because the prosecution did not present evidence at the preliminary hearing of four separate acts of oral copulation. We reverse with instructions to dismiss one of the four counts related to oral copulation.

However, in all other respects we affirm defendant's conviction. Because the out-of-court statements defendant challenges were not testimonial, they were not subject to the confrontation clause, and, as information an expert relied upon, they were admissible

---

[1]     All further statutory references are to the Penal Code.

over a hearsay objection. The two counts of molestation defendant challenges were based on separate and distinct acts and were not subject to section 654.

SUMMARY

Defendant sexually assaulted his daughter several times over an approximately five-year period. His daughter, Jane, was born in August of 1997 and lived with Villesca in San Bernardino, California along with her mother and her brother until defendant's arrest in 2011. All of the known sexual assaults occurred when Jane was between nine and 14 years old. Jane was 15 years old when she testified at defendant's trial.

A. The Molestations

Jane was mostly unable to give specific dates for when she was assaulted. However, she was able to give specific details relating to some incidents and approximations of when they occurred. Though Jane did not remember in detail every incident of sexual abuse, she was able to give estimates of how many times defendant forced her to participate in specific sex acts. Jane stated that defendant, over the five-year period, forced his penis into her anus between seven and 10 times, penetrated her vagina with his penis between two and three times, licked her vagina between two and three times or "probably more than three times," and penetrated her vagina with his fingers over 20 times.

The first incident of sexual abuse Jane could remember occurred when she was approximately nine or 10 years old. Jane was in her bed when she woke up at night. There was a towel placed underneath her body and her underwear had been removed and placed on the floor. She caught sight of her father leaving her bedroom. Jane also noticed a gooey white substance around her genitalia and an odor. Jane recognized the

3

smell, which she associated with an earlier incident where she walked in on her father and her mother engaging in sexual intercourse. Jane took a shower to clean herself off and went back to bed. She did not tell anyone what had happened.

Approximately two weeks later, Jane was home alone with defendant when he grabbed her, took her to his bedroom and placed her on his bed. Holding her down with her stomach against the bed and feet hanging over the edge, defendant striped off Jane's clothes and began fondling her genitalia and inserting his fingers into her vagina. Jane screamed for help, and defendant placed his hand over Jane's mouth to muffle her. After the digital penetration, defendant inserted his penis into Jane's anus. Defendant penetrating Jane's vagina and anus caused her pain. Jane also reported that defendant licked her vagina during this incident, though she was uncertain as to when that occurred in relation to the other sex acts.

While testifying at defendant's trial, Jane recalled another sexual assault that occurred sometime when she was 10 or 11 years old. After arriving home from school, defendant threw Jane down onto the living room couch, stripped off her clothes and began inserting his fingers into her vagina. Jane recalled defendant licking her vagina and penetrating her vagina with his penis during this incident. Jane also reported being molested by defendant multiple times in her bedroom, but she did not testify to any specific incidents except for one that occurred a couple of days prior to defendant's arrest. Jane attempted to escape these molestations by sleeping in her brother's room, but defendant would molest her there as well.

Defendant stopped molesting Jane during seventh grade as she entered puberty, but he started assaulting her again in ninth grade. He would enter Jane's room at night

4

when her mother and brother were not home and fondle her breasts and genitalia. At this time, defendant began threatening to disclose embarrassing journal entries to coerce Jane. Jane testified that defendant had read her diary and made photocopies of an entry where Jane referred to her cousin as a bitch. Defendant would leave copies in Jane's room with messages written on them stating: "one more time." That same year, Jane discovered a web camera that had been surreptitiously placed in her bedroom closet.

One of Jane's aunts was a social worker, and Jane kept her card pinned to a board in her bedroom. Defendant was afraid Jane would reveal the molestations to her and questioned Jane on whether she had revealed anything to her aunt or anyone else at least five times, according to Jane's testimony.

Defendant used explicit threats of violence to control Jane, telling her that he would kill her and her mother if she told anyone. Jane recounted two separate instances during her ninth grade year when defendant brandished a gun and threatened to kill her if she revealed the molestations. During the first incident, defendant took Jane to his bedroom and began touching her. Jane resisted and, in response, defendant took a black hand gun out of a drawer. He practiced firing blanks and told Jane that he would use that gun if she ever told anyone about the molestations. During a second incident, Jane was home doing homework in her brother's room when defendant came in with a silver hand gun and told Jane that if she told anyone about the molestations, he would kill her, her mother and anyone she told.

At least two incidents of sexual molestation occurred during the week preceding defendant's arrest. Two nights before defendant's arrest, Jane was in her bed text messaging her friend Gavin. Jane heard the door to the room close. She shut off her cell

5

phone and pretended to be asleep.  Defendant was in the room and began touching Jane's genitals.  Jane then pretended to wake from her sleep, and defendant left the room.

A second incident occurred the following day, September 29, 2011.  At trial, Jane testified that defendant picked her up from school and took her home.  He took her to his bedroom and began fondling her genitals and penetrating her vagina with his fingers.  The penetration was painful; Jane begged defendant to stop and dropped to the floor in an attempt to free herself.  In response, defendant threatened to rape or sodomize Jane, stating that he would "take it out and stick it in and make sure it hurts."  On the same day, Jane told her friend B.G. about the incident.

B.  Investigation and Arrest

The following day, September 30, 2011, defendant sent Jane a sexually explicit text message while she was in class.  The message read:

"Hi, [Jane].  I feel that you are mad at me.  Please don't be.  This will all be over with real soon.  I told you when I get some of your shaved pussy, I will never ever do anything else.  I know you are not going to be willing, so I'm just going to take it from you and it's a promise I'm -- I'm not breaking.  Always remember that no matter what, I will always love you.  Erase this."

Jane forwarded the message to her friend, B.G.  Jane had previously confided in B.G. concerning defendant's sexual abuse.  B.G. told her mother about the situation, and B.G.'s mother contacted school authorities.  At the moment B.G. received the text message, she and her mother were at a school counselor's office discussing the situation.  B.G. showed the counselor the message, and Jane soon came to the office to explain the situation further to school authorities.  The police were called, and Jane was interviewed

6

by San Bernardino Police Officer Robert Richards at the school. Jane would later be interviewed on video by San Bernardino Detective Chris Gray from the San Bernardino Police Department. This video was shown to the jury at trial.

Defendant was arrested the same day by San Bernardino police. While searching his home, police recovered two handguns matching Jane's descriptions from underneath defendant's mattress as well as a web camera that had been hidden in Jane's closet. During interrogation by San Bernardino Police Detective Anthony King, defendant admitted to touching Jane's genitalia and anus under her clothes with his bare hand on multiple occasions, the final incident occurring two days before he was arrested. He also admitted placing a web camera in Jane's bedroom to observe her in the nude, sending sexually suggestive text messages, and acknowledged ownership of the guns recovered from his home. Defendant denied ever committing any penetrative sexual acts with Jane or performing oral sex on her.

C. Trial Court Proceedings

Defendant was charged by the San Bernardino County District Attorney with 27 counts of sexual assault against his daughter. A firearm charge was also alleged.[2] On all

---

[2] The information alleged: 12 counts of aggravated sexual assault upon a child under age 14 when defendant was seven or more years older (§§ 261, subd. (a)(2), (6), 269, subd. (a)(1) [counts 1 & 2, rape]; §§ 269, subd. (a)(3), 286, subds. (c)(2), (3) & (d) [count 3, sodomy]; §§ 269, subd. (a)(4), 288a, subds. (c)(2), (3) & (d) [counts 4-6, oral copulation]; and §§ 289, subd. (a), 269, subd. (a)(5) [counts 7-12, sexual penetration]); five counts of committing a forcible lewd act upon a child under the age of 14 (§ 288, subd. (b)(1) [counts 13-17]); one count of sexual penetration of a minor over the age of 14 with a foreign object (§ 289, subd. (a)(1)(C) [count 18]); one count of sodomy by use of force (§ 286, subd. (c)(2)(A) [count 19]); one count of oral copulation of a person under the age of 14 and more than 10 years younger than defendant (§ 288a, subd. (c)(1) [count 20]); one count of sexual battery by restraint (§ 243.4, subd. (a) [count 21]); one count of committing a lewd act upon a child 14 years of age and who was at least 10

counts, the district attorney alleged defendant had suffered a prior serious or violent felony conviction. Defendant pled guilty to the firearm charge during pretrial proceedings and admitted to having previously suffered the prior conviction.

In addition to testimony from Jane, at trial the prosecution presented testimony from Dr. Amy Young, a forensic pediatrician with the University of Loma Linda Children's Hospital and associate medical director at the Children's Assessment Center (the CAC). Dr. Young conducted a forensic examination of Jane on October 27, 2011. Dr. Young examined Jane's genitalia. She found dimpling, scar tissue and other indications that Jane had been sexually abused. Dr. Young testified at trial that these injuries could have been caused by a penis or a finger penetrating Jane's vagina. Dr. Young also examined Jane's anus but did not find any indications of abuse. During her forensic examination, Dr. Young took photographs of Jane's genitalia and completed a standard report setting forth her findings.

At trial, Dr. Young testified that she usually consulted with other doctors or nurse practitioners on her team about her findings before completing the report. She also testified that she would review her findings with other doctors and nurse practitioners during weekly case review sessions. According to Dr. Young, the other staff members who reviewed her findings at the weekly case review session agreed with her conclusions.

---

years younger than defendant (§ 288, subd. (c)(1) [count 22]); one count of unlawful possession of a firearm by a felon (former § 12021, subd. (a)(1) [count 23]); and five counts of committing a lewd act upon a child under the age of 14 (§ 288, subd. (a) [count 24]).

8

Defendant did not testify at trial. The defense called as an expert witness Cari Caruso, a registered nurse who had previously worked as a forensic sexual assault nurse before starting her own business as a consultant. Caruso was critical of Dr. Young's report, claiming Dr. Young failed to fill out the report in proper detail. She also criticized Dr. Young's conclusions. Based upon her review of the photographs, Nurse Caruso stated she saw no evidence of any sexual trauma.

Though defendant did not plead guilty to any of the sexual assault charges, during her closing argument his attorney essentially conceded that Jane had been abused by defendant. Defendant's counsel stated: "We may start with the idea that what has happened here that there is no question that he's guilty. And I'm here to ask you to give him a fair trial. I asked you that in the beginning and I ask you again, give him a fair trial.

"He has told you what he has done. And this behavior is horrible. This behavior is the type of behavior that should not befall any child. This behavior is horrific. But, I ask you to think about what you've seen through this trial when you think about what happened here and the fact that something horrible has happened to this child."

Defendant's counsel urged the jury to look at each charge in a critical manner. Counsel argued that Jane's memories of what happened were likely colored by her emotional trauma and called upon the jurors to pay attention to discrepancies between what Jane told investigating police officers on the day of defendant's arrest and Jane's testimony at trial.

The jury convicted defendant on all charges except for counts 1 and 2, which alleged that defendant raped Jane. The jury could not reach a verdict on the charges of

9

rape, and a mistrial was declared as to those charges. As we indicated at the outset, the trial court sentenced defendant to an indeterminate term of 300 years to life in prison plus a determinant term of 156 years eight months.[3] Defendant filed a timely notice of appeal.

DISCUSSION

I

The first issue defendant raises on appeal is his contention that he was improperly bound over on a fourth charge of oral copulation. He contends the evidence presented at his preliminary hearing only supported three such charges. Defendant further contends his attorney was ineffective in failing to object to the information charging him with four counts of oral copulation. Alternatively, defendant contends he could not have been convicted of the fourth oral copulation charge because the people failed to produce substantial evidence at trial that a fourth oral copulation occurred.

We agree the evidence presented at the preliminary hearing did not support a fourth oral copulation charge, that defendant's attorney erred in failing to object to trial on a fourth charge, and that the error was prejudicial. We reverse defendant's conviction on all four oral copulation counts, with directions that one of the counts be dismissed and

---

3     The trial court sentenced defendant as follows: on counts 3 through 12, the court imposed on each count a consecutive indeterminate term of 30 years to life; on counts 13 through 17 and counts 19 and 20, the court imposed on each count a consecutive term of 16 years; on count 18, the court imposed a consecutive term of 20 years; on count 21, the court imposed a consecutive term of two years; on counts 22 and 23, the court imposed on each count a consecutive term of one year four months; on counts 24 through 28, the court imposed on each count a consecutive term of four years.

that judgment on the three remaining oral copulation counts be entered and defendant resentenced.

A. Additional Factual Background:

In an amended information filed on October 14, 2011, the San Bernardino County District Attorney charged defendant with three acts of oral copulation (§ 269, subd. (a)(4) [counts 4, 5 & 6, aggravated sexual assault of a child–oral copulation]) and oral copulation of a person under 14 years old (§ 288a, subd. (c)(1) [count 20]).

At the preliminary hearing, Detective Chris Gray, who had interviewed Jane, testified as follows:

"[Detective Gray]: . . . I asked her if [defendant] had ever made her orally copulate him. She said that never happened. I asked her if he ever orally copulated her, and she said that has happened.

"Q. Did she say how many times?

"A. I'd have to look. I believe a handful of times.

"Q. Would it refresh your recollection to look at your report?

"A. It would.

"[Prosecutor]: May he?

"The Court: That's fine.

"The Witness: I can't find it exactly. [¶] Well, she said three different times.

"Q. [Prosecutor:] On the oral copulation, him on her?

"A. Yes."

Detective Gray's testimony was derived from an interview he conducted with Jane.

11

B. Legal Principles

Section 1009 states in pertinent part: "An indictment or accusation cannot be amended so as to change the offense charged, *nor an information so as to charge an offense not shown by the evidence taken at the preliminary examination.*" In discussing this provision and the cases that have interpreted it, the court in *People v. Burnett* (1999) 71 Cal.App.4th 151, 165-167 (*Burnett*) stated: "Many cases illustrate the rule that a defendant may not be prosecuted for an offense not shown by the evidence at the preliminary hearing or arising out of the transaction upon which the commitment was based. In *People v. Fyfe* (1929) 102 Cal.App. 549, 553, 555, upholding the trial court's dismissal of charges not shown by the evidence at the preliminary hearing, this court stated: 'The clear purpose of these enactments is to give the accused a preliminary hearing either before a grand jury or before a committing magistrate, and to deny to the district attorney the right to force a defendant to trial before a jury upon an information which is not within the scope of the evidence taken. [¶] . . . [¶] . . . In declaring that an information "cannot" be amended so as to charge an offense not shown by the evidence taken at the preliminary examination, the terms of the section are mandatory. They are in whole harmony with the provisions of section 8 of article 1 of the Constitution [now section 14] requiring an examination and commitment by a magistrate as a prerequisite to the filing of an information by the district attorney.'

"In *People v. Kellin* (1962) 209 Cal.App.2d 574, the defendant was charged with grand theft on or about November 10, 1960; the evidence at the preliminary hearing showed theft of a $2,093 check on November 10, 1960. At trial, the prosecution offered evidence of theft of three additional checks on October 23 and December 8. After the

12

prosecution's case, the district attorney successfully moved to amend the information to charge theft '"on or about the 28th day of October through the 28th day of December, 1960."' (*Id*., at p. 575.) Reversing the conviction, *Kellin* held the amendment 'allowed the defendant to be charged and perhaps convicted of an offense not shown by the evidence at the preliminary examination.' (*Id*., at p. 576.) The court noted that each of the checks represented a 'separate and distinct transaction,' not related to the check which was the basis of the order of commitment after the preliminary hearing and offered to show a distinct theft. (*Ibid*.)

"In *People v. Winters* (1990) 221 Cal.App.3d 997, the defendant was charged with possession for sale of methamphetamine and waived his right to a preliminary hearing. During trial, the prosecution was permitted to amend the information to add a charge of transportation of methamphetamine. The appellate court reversed the transportation conviction, even though the evidence showed this offense arose out of the same incident as the possession charge: 'We acknowledge that respondent's motion to amend the information to add a count for transportation of methamphetamine may have come as no surprise to appellant and would have conformed the information to the proof at trial, as respondent argues here and argued below. It seems to us that is not the point nor helpful to respondent. Section 1009 specifically proscribes amending an information to charge an offense not shown by the evidence taken at the preliminary hearing. This rule has remained virtually unchanged for over 80 years.' (221 Cal.App.3d at p. 1007.) In *Winters*, because there was no preliminary hearing, the prosecution could not amend the information to add a new charge."

In *Burnett*, the defendant was charged with and convicted of being a felon in possession of a firearm. At his preliminary hearing, the prosecution offered evidence of a single incident in which the defendant was in possession of a .38-caliber revolver; at trial, however, the prosecution offered evidence that the defendant possessed both a .38-caliber revolver in one incident and a .357-caliber revolver in a separate incident. Because no evidence of the incident involving the .357-caliber revolver had been offered at the preliminary hearing, the court found that an amendment to the information that permitted the jury to find the defendant guilty based on either incident was improper and, importantly for our purposes, that in failing to object to the amendment his counsel had rendered ineffective assistance of counsel. (*Burnett*, *supra*, 71 Cal.App.4th at pp. 178-179.) The court found that there was no conceivable tactical advantage in failing to object to the amendment. (*Id.* at p. 181.)

C. Analysis

The Attorney General asserts that the evidence presented at the preliminary hearing demonstrated probable cause that defendant orally copulated his daughter four times because Jane's statements to the police were ambiguous as to how many times defendant orally copulated her. This claim of ambiguity rests upon the notion that when Jane told Detective Gray she had been orally copulated three times, she meant she had been orally copulated "three times" in addition to the first incident she talked about earlier in her questioning. Jane's statements to Detective Gray are in fact not ambiguous at all in regards to how many times she had been orally copulated in total. Jane was asked, "how many times do you think he's [defendant] licked your vagina?" She answered, "three times." The detective then asked her, "Three different times?" and Jane

14

replied, "uh huh." Neither the phrasing of the questions nor Jane's answers indicate that Jane was excluding the first incident of oral copulation from her answers and really meant to say she had been orally copulated four times.

Importantly, Detective Gray's recollection of Jane's statements to him were the only evidence at the preliminary hearing regarding how many times defendant orally copulated her. Thus, there was no evidence presented at the preliminary hearing that defendant orally copulated Jane a fourth time.

We recognize that when a defendant is accused of child molestation based upon generic testimony from victims, "'at a minimum, a defendant must be prepared to defend against all offenses of the kind alleged in the information *as are shown by evidence at the preliminary hearing to have occurred within the timeframe pleaded in the information.*'" (*People v. Jones* (1990) 51 Cal.3d 294, 317 (*Jones*).) The Attorney General relies on *Jones*, arguing that because its allows generic testimony to bind over and convict resident child molesters, even when the victim can only testify in a general way as to what occurred over a lengthy period and cannot specifically recall specific incidents of molestation or their dates, we should treat Detective Gray's testimony in the same manner. The Attorney General is asking for a much too broad application of *Jones. Jones* allows generic testimony at a preliminary hearing when a victim is unable to precisely identify the time and place of a molestation as long as the victim can give a date range for when the assaults occurred and offer specific details as to the kinds and number of sexual acts that occurred. (*Id.* at pp. 317-318.) *Jones* does not provide support for conviction on charges not supported by evidence presented at the preliminary hearing. (See *Burnett*, *supra*, 71 Cal.App.4th at p. 175.)

15

Because defendant could not be convicted upon a charge not supported by the evidence presented at the preliminary hearing, defendant's trial counsel acted ineffectively in failing to object to the amended information, which alleged four separate acts of oral copulation. (See *Burnett*, *supra*, 71 Cal.App.4th at p. 181.) As in *Burnett*, there was no tactical reason or advantage in permitting the prosecution to pursue four counts of oral copulation. Because defendant was convicted on all four counts, counsel's error was plainly prejudicial. We therefore reverse defendant's conviction on the oral copulation counts, counts 4, 5, 6 and 20.[4]

II

Next, we turn to defendant's confrontation clause contention. As we have noted, at trial, Dr. Young, a forensic pediatrician who examined Jane Doe, testified to discovering physical signs of sexual abuse. Dr. Young further testified that she showed her report and photographs of Jane's genitals to colleagues who concurred with her findings. Defendant claims that Dr. Young's reference to her colleague's opinions violated his right to confront testimonial witnesses under the Sixth Amendment to the United States Constitution and that Dr. Young's reference was also inadmissible hearsay under the Evidence Code. As we explain, Dr. Young's colleagues' statements concurring with her

---

[4]     Each of the four oral copulation counts alleged in the information is set forth in the manner permitted under *Jones*: each alleges that an act of oral copulation occurred "[o]n or about August 28, 2006 through August 27, 2011." There is no dispute the evidence supports defendant's convictions on at least three of these counts and having found that a fourth should not have been pled, we need not and do not reach the question of whether the evidence at trial supported conviction on a fourth count. Given the similar manner in which the counts have been pled, we leave it to the parties and the trial court on remand to determine which one of the four oral copulation counts should be dismissed and on which of the remaining three counts judgment should be entered again and defendant resentenced.

16

opinions were not testimonial within the meaning of the confrontation clause. Moreover, as a description of the process by which Dr. Young reached her expert conclusions, the statements were not subject to exclusion as hearsay.

A. Additional Factual Background

Roughly a month after defendant's molestation of Jane, the forensic examination was performed at the CAC. The CAC is an outpatient facility for children who have been abused or are suspected of having been abused. The CAC is a centralized facility that provides a range of services for abused children in San Bernardino County and is a partnership between a number of agencies and entities in the county. The CAC has agreements and memoranda of understanding with various law enforcement agencies in San Bernardino County. The CAC was conceived to reduce the stress caused to child abuse victims by reducing the number of adults to whom they must disclose the details of their abuse. On-site social workers conduct forensic interviews of potential victims. Forensic medical examinations are conducted on site by doctors and nurse practitioners from the University of Loma Linda Children's Hospital. Victims involved in investigations being conducted by law enforcement are brought to the CAC and given a forensic examination paid for by law enforcement agencies.

The forensic medical examinations conducted on victims are comprehensive. Physicians examine the eyes, ears and nose and listen to their patients' hearts and lungs. The genitals are examined using a large magnifying device called a colposcope.

The examination of Jane was conducted on October 27, 2011 by Dr. Young. Dr. Young testified that she had performed thousands of such examinations in the past and had testified in court over 100 times.

17

During and after the examination, Dr. Young completed a report of her findings using a standardized form known as a Cal EMA 925. Jane did not see a forensic interviewer at the CAC because she had already described defendant's abuse of her to officers of the San Bernardino Police Department. Dr. Young had access to the police report. The cost of the examination was paid by the San Bernardino Police Department under the terms of a memorandum of understanding between the CAC and the police department.

During the examination, Dr. Young asked Jane if she had experienced any physical symptoms. Jane reported to Dr. Young that she would sometimes experience a burning sensation while urinating after molestations as well as itching and vaginal discharge. She also reported being constipated and nauseous. Dr. Young examined Jane's genitals and noted "dimpling" of the skin at the base of the hymen and an "irregularly-shaped area in the base of the fossa,[5] like matted down skin with a hypopigmented scar." Dr. Young considered this to be a definite sign of trauma caused to Jane's genitals by some kind of penetration, though Dr. Young could not testify as to exactly what caused the trauma to Jane's genitals. The doctor also noticed finger like projections on one edge of Jane's hymen. Dr. Young examined Jane's anus and found no signs of abuse. Dr. Young testified that her findings were not dispositive of the possibility that Jane had been anally penetrated and that most victims who have been sodomized show no physical signs. In her report, Dr. Young recorded her findings regarding the genitals as being abnormal and "[d]efinite evidence of sexual abuse or

---

5       The fossa navicularis is a part of the hymen.

18

and/or sexual contact." During the exam, Dr. Young took photographs of Jane's genitals and drew diagrams in the report.

Dr. Young testified that she routinely consulted with other medical professionals on her team regarding her findings when filling out such reports, usually on the same day as the exam. Dr. Young also participated in weekly review sessions where the medical staff would meet and discuss their cases from the past week.

While testifying at trial, the following exchange occurred between the prosecutor and Dr. Young:

"Q [prosecutor] Did you review those photographs with any other medical professionals in your facility?

"A [Dr. Young] Yes.

"Q And who is that?

"A Dr. Claire Sheridan, Dr. Mark Massey, and then either both or one of the nurse practitioners.

"Q Did they agree with your impression?

"[Defense counsel]: Objection, Your Honor, hearsay.

"THE COURT: It is hearsay, however, experts are allowed to consider things outside of the record and the jury is told about those items so they can evaluate the expert's opinion. [¶] So you can answer.

"THE WITNESS [Dr. Young]: Yes, they did agree."

On cross examination, Dr. Young testified that she "gave the photograph to other child abuse experts and they agreed with the findings of the scar." She shared her findings with her team, which is composed of three doctors, including her, and two nurse

practitioners. Dr. Young testified that she was uncertain as to which members of her team were present to review her findings, but she knew for certain that Dr. Sheridan was present to review her findings. On redirect, Dr. Young testified that she had recently spoken with Dr. Sheridan and reviewed the photographs.

B. Confrontation Clause Jurisprudence

Our current Sixth Amendment jurisprudence emanates from the United States Supreme Court's ruling in *Crawford v. Washington* (2004) 541 U.S. 36 (*Crawford*). The high court had previously construed the confrontation clause as allowing the admission of an out-of-court statement as evidence if the statement had "particularized guarantees of trustworthiness." (*Ohio v. Roberts* (1980) 448 U.S. 56, 66.) *Crawford* overturned this standard, finding that the Sixth Amendment completely barred the admission of testimonial out-of-court statements unless the witness was unavailable to testify and the defense had a prior opportunity to cross-examine the witness. Justice Scalia, writing for the majority, stated that "'[t]estimony,' in turn, is typically '[a] solemn declaration or affirmation made for the purpose of establishing or proving some fact.' [Citation.] An accuser who makes a formal statement to government officers bears testimony in a sense that a person who makes a casual remark to an acquaintance does not." (*Crawford*, at p. 51.) Justice Scalia offered the following nonexclusive list of items considered testimonial: "'[E]x parte in-court testimony or its functional equivalent—that is, material such as affidavits, custodial examinations, prior testimony that the defendant was unable to cross-examine, or similar pretrial statements that declarants would reasonably expect to be used prosecutorially,' . . . 'extrajudicial statements . . . contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions,'

20

[citation];statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial,' [citation]." (*Id.* at pp. 51-52.)

In *Melendez-Diaz v. Massachusetts* (2009) 557 U.S. 305 (*Melendez-Diaz*), a laboratory's certificates of analysis were introduced as evidence in a prosecution for cocaine distribution and trafficking. The certificates were sworn statements that laboratory testing had shown a substance recovered from defendant's car was cocaine. (*Id.* at p. 308.) The court found the certificates were affidavits and, thus, testimonial. (*Id.* at p. 310.) The majority opinion noted that the certificates, which affirmed that the substance examined by the lab was in fact cocaine, served the same purpose that live testimony from the examiners would have and that the examiners would have been aware that the sworn statements they were making would have been used for prosecution. (*Id.* at pp. 310-311.)

In his concurring opinion, Justice Thomas stated: "'[T]he Confrontation Clause is implicated by extrajudicial statements *only insofar as they are contained in formalized testimonial materials*, such as affidavits, depositions, prior testimony, or confessions.'" (*Melendez-Diaz*, *supra*, 557 U.S. at p. 329, italics added (conc. opn. of Thomas, J.).) Justice Thomas concurred in the court's opinion because he regarded the certificate as an affidavit. (*Id.* at p. 330 (conc. opn. of Thomas, J.).)

The high court again addressed the issue of when a nontestifying witness's statement is testimonial in *Bullcoming v. New Mexico* (2011) 564 U.S. ___ [131 S.Ct. 2705]. As in *Melendez-Diaz*, in *Bullcoming* the prosecution introduced at trial a certificate prepared by a nontestifying laboratory analyst. This certificate stated that

21

blood samples taken from the defendant showed he had blood alcohol levels above the legal limit. (*Bullcoming*, *supra*, 131 S.Ct. at p. 2709.) Unlike the affidavit in *Melendez-Diaz*, in *Bullcoming* the statement contained in the certificate was not sworn before a notary public. (*Ibid.*) The court found this distinction insignificant. The court said the certificate was "'formalized' in a signed document" that made reference to New Mexico court rules providing "for the admission of certified blood-alcohol analyses." (131 S.Ct. at p. 2717.) These "formalities" were, in the court's view, "more than adequate" (*ibid.*) to qualify the laboratory certificate as testimonial, and hence inadmissible.

The last and most relevant of the United States Supreme Court cases to address the question of what constitutes out-of-court testimony is *Williams v. Illinois* (2012) 567 U.S. ___ [132 S.Ct. 2221] (*Williams*). The case involved the kidnapping, robbery and rape of a Chicago woman. (132 S.Ct. at p. 2229.) Semen obtained from a vaginal swab of the victim was sent by state police to Cellmark, a private laboratory based in Maryland. At trial, Sandra Lambatos, a forensic expert with the Illinois State Police, testified as an expert witness for the prosecution. She testified that Cellmark had tested the semen and developed a DNA profile that was sent back to the state police. The Cellmark DNA profile matched a DNA profile the state police lab had created from a blood sample taken from the defendant after an arrest for an unrelated offense. The DNA report prepared by Cellmark was not entered into evidence. (*Id.* at pp. 2229-2230.)

The court upheld the admission of Lambatos's statement by a five-to-four vote. Justice Alito wrote a plurality opinion for himself, Chief Justice Kennedy and Justice Breyer, while Justice Thomas authored a concurring opinion that heavily criticized the plurality's rationale but concurred in the result. Justice Kagan wrote a dissent, which was

22

joined by Justice Scalia, the author of the majority opinion in *Crawford*, and Justices Ginsburg and Sotomayor.

Justice Alito's plurality opinion in *Williams* set forth two rationales for its conclusion the Cellmark report was not testimonial: (1) Lambatos did not testify to the truth of the Cellmark report, and (2) the report was not prepared to target an identified suspect. As to the first rationale, Justice Alito wrote that the federal and Illinois rules of evidence allow a witness to offer an out-of-court statement, not for the truth of the matter, but solely to explain the basis for the expert's opinion. Lambatos did not make any warrant to the truth of the report, which was not entered into evidence. She only stated that the report contained a DNA profile that matched the defendant's. (*Williams*, *supra*, 132 S.Ct. at p. 2235.)

As to the second rationale, Justice Alito wrote: "The abuses that the Court has identified as prompting the adoption of the Confrontation Clause shared the following two characteristics: (a) they involved out-of-court statements having the primary purpose of accusing a targeted individual of engaging in criminal conduct and (b) they involved formalized statements such as affidavits, depositions, prior testimony, or confessions." (*Williams*, *supra*, 132 S.Ct. at p. 2242.)

The plurality opinion noted that no suspect was known or identified when the semen samples were tested or when the DNA profile produced by Cellmark was tested against the state database. (*Williams*, *supra*, 132 S.Ct. at pp. 2243-2244.) According to Justice Alito, the primary purpose of the testing was to stop an ongoing emergency by indentifying a rapist who was still at large, not to incriminate a known and targeted suspect. (*Ibid*.) As such, there was little risk that any of the Cellmark technicians would

23

have falsified evidence as they did not know whose DNA they were sampling or its exact purpose.  (*Ibid.*)

In his concurrence, Justice Thomas found that the Cellmark report was nontestimonial evidence "solely because Cellmark's statements lacked the requisite 'formality and solemnity' to be considered '"testimonial"' for purposes of the Confrontation Clause."  (*Williams*, *supra*, 132 S.Ct. at p. 2255 (conc. opn. of Thomas, J.).)  Justice Thomas stated that "the Confrontation Clause reaches '"formalized testimonial materials,"' such as depositions, affidavits, and prior testimony, or statements resulting from '"formalized dialogue,"' such as custodial interrogation."  (*Id.* at p. 2260 (conc. opn. of Thomas, J.).)  "The Cellmark report lacks the solemnity of an affidavit or deposition, for it is neither a sworn nor a certified declaration of fact.  Nowhere does the report attest that its statements accurately reflect the DNA testing processes used or the results obtained. . . .  The report is signed by two 'reviewers,' but they neither purport to have performed the DNA testing nor certify the accuracy of those who did. . . .  And, although the report was produced at the request of law enforcement, it was not the product of any sort of formalized dialogue resembling custodial interrogation."  (*Ibid.*)

Justice Thomas joined the dissent in rejecting the plurality's view that the statements regarding the Cellmark report were admissible because the testimony was not offered to prove the truth of the matter.  (*Williams*, *supra*, 132 S.Ct. at p. 2257 (conc. opn. of Thomas, J.).)  "[S]tatements introduced to explain the basis of an expert's opinion are not introduced for a plausible nonhearsay purpose.  There is no meaningful distinction between disclosing an out-of-court statement so that the factfinder may evaluate the expert's opinion and disclosing that statement for its truth."  (*Ibid.*)

24

Justice Thomas also criticized the plurality's invocation of a "primary purpose test" based upon whether a known suspect is being targeted as lacking "any grounding in constitutional text, in history, or in logic." (*Williams*, *supra*, 132 S.Ct. at p. 2262 (conc. opn. of Thomas, J.).) Justice Thomas agreed that for a statement to be testimonial, a "declarant must primarily intend to establish some fact with the understanding that his statement may be used in a criminal prosecution. [Citation.] But this necessary criterion is not sufficient, for it sweeps into the ambit of the Confrontation Clause statements that lack formality and solemnity." (*Id.* at p. 2261 (conc. opn. of Thomas, J.).) Justice Thomas further criticized the plurality's "primary purpose test" stating: "There is no textual justification, however, for limiting the confrontation right to statements made after the accused's identity became known." (*Id.* at p. 2262 (conc. opn. of Thomas, J.).)

The California Supreme Court applied the principles set forth in *Williams* in *People v. Lopez* (2012) 55 Cal.4th 569 (*Lopez*) and *People v. Dungo* (2012) 55 Cal.4th 608 (*Dungo*). In *Lopez*, prosecutors introduced into evidence a laboratory analyst's report on the blood alcohol level of the defendant. The analyst who prepared the report did not testify. A colleague from the lab testified in his place. (*Lopez*, at p. 573.) The court found most of the lab report itself was nontestimonial because it consisted of data generated by a machine rather than any statement by the nontestifying analyst. (*Id.* at p. 583.) However, in addition to the data recorded in the report, the nontestifying analyst made notations on the first page of the report which indicated that the blood sample had come from the defendant. The court found that these notations posed a "more difficult question" than the mechanically generated data. (*Ibid*.) "Of significance here is the indication on page 1 of nontestifying analyst Peña's laboratory report that defendant's

blood sample was labeled with laboratory No. 070–7737, which was entered by laboratory assistant Constantino. Based on that labeling and the machine-generated results for blood sample No. 070–7737, prosecution expert witness Willey gave his independent opinion—reflecting his 'separate abilities as a criminal analyst'—that defendant's blood sample contained 0.09 percent alcohol. It is undisputed that Constantino's notation linking defendant's name to blood sample No. 070–7737 was admitted for its truth. (Compare *Williams*, *supra*, 567 U.S. at p. ___ [132 S.Ct. 2221], in which the plurality opinion, Justice Thomas's concurring opinion, and the dissenting opinion disagreed on whether the pertinent evidence was admitted for its truth.) Thus, the critical question here is whether that notation is testimonial hearsay and hence could not be used by the prosecution at trial." (*Lopez*, at p. 584.)

The court then determined that the subject notations were *not* testimonial because they lacked formality: "The notation in question does not meet the high court's requirement that to be testimonial the out-of-court statement must have been made with formality or solemnity. (See *Davis v. Washington* [(2006)] 547 U.S. [813,] 830, fn. 5 ['formality is indeed essential to testimonial utterance']; *Melendez-Diaz*, *supra*, 557 U.S. at p. 310 [stressing that each of the laboratory certificates determined to be testimonial was 'a "'solemn declaration or affirmation"'"]; *Bullcoming*, *supra*, 564 U.S. at p. ___ [131 S.Ct. at p. 2717] [the laboratory certificate found to be testimonial was '"formalized" in a signed document' that referred to 'rules' that made the document admissible in court.) Although here laboratory analyst Peña's initials appear on the same line that shows defendant's name and laboratory assistant Constantino's initials appear at the top of the page to indicate that he entered the notation that defendant's blood sample was given

26

laboratory No. 070–7737, neither Constantino nor Peña signed, certified, or swore to the truth of the contents of page 1 of the report.  The chart shows only numbers, abbreviations, and one-word entries under specified headings.  Thus, the notation on the chart linking defendant's name to blood sample No. 070–7737 is nothing more than *an informal record of data for internal purposes*, as is indicated by the small printed statement near the top of the chart: 'for lab use only.'  Such a notation, in our view, is not prepared with the formality required by the high court for testimonial statements." (*Lopez*, *supra*, 55 Cal.4th at p. 584, italics added.)

In rejecting the defendant's argument that the notations were like the documents in dispute in *Melendez-Diaz* and *Bullcoming*, the court in *Lopez* emphasized that the disputed notations lack any indicia of formality:  "Defendant argues that nontestifying analyst Peña's laboratory report is indistinguishable from the laboratory certificates that the high court determined to be testimonial in *Melendez-Diaz* and *Bullcoming*.  Not so.  In *Melendez-Diaz*, 'the certificates were sworn to before a notary . . . ' by the testing analysts who had prepared the certificates.  (*Melendez-Diaz*, *supra*, 557 U.S. at p. 308.)  And in *Bullcoming*, the laboratory analyst's certificate regarding the result of his analysis was '"formalized" in a signed document' that expressly referred to court rules providing for the admissibility of such certificates in court.  (*Bullcoming*, *supra*, 564 U.S. at p. ___ [131 S.Ct. at p. 2717].)  Such formality is lacking here."  (*Lopez*, *supra*, 55 Cal.4th at pp. 584-585.)

The majority opinion in *Lopez* was written by Justice Kennard and had the concurrence of the Chief Justice and Justices Baxter, Werdegar and Chin.  Justice Corrigan wrote a separate opinion in which she concurred in the result because she found

27

that the analyst's notations were not written for the purpose of providing evidence at trial but were "primarily 'for the administration of an entity's affairs.'" (*Lopez*, *supra*, 55 Cal.4th at p. 590 (conc. opn. of Corrigan, J.).)[6] Justice Liu dissented. In analyzing the Supreme Court's confrontation clause jurisprudence, Justice Liu concluded that only Justice Thomas believed that out-of-court statements need to be formalized in the manner required by the *Lopez* majority and that his sole opinion did not represent binding authority. (*Lopez*, at p. 594 (dis. opn. of Liu, J.).) Justice Liu further concluded that because the report and the notations were prepared by a county crime laboratory, they were indisputably prepared as evidence to be offered at defendant's trial and subject to the limitations of the confrontation clause. (*Id*. at pp. 602-603 (dis. opn. of Liu, J.).)

In *Dungo*, the court considered the question of whether a testifying expert could rely upon an autopsy report prepared by a nontestifying expert witness. The court stated: "First, to be testimonial the statement must be made with some degree of formality or solemnity. Second, the statement is testimonial only if its primary purpose pertains in some fashion to a criminal prosecution. The high court justices have not, however, agreed on what the statement's primary purpose must be." (*Dungo*, *supra*, 55 Cal.4th at p. 619.) In analyzing for formality and solemnity, the court, relying upon a footnote from *Melendez-Diaz* regarding medical reports, divided statements in medical reports into two categories: "(1) statements describing the pathologist's anatomical and physiological observations about the condition of the body, and (2) statements setting forth the pathologist's conclusions as to the cause of the victim's death." (*Dungo*, at p. 619.)

---

6    Justices Baxter, Werdegar and Chin concurred in Justice Corrigan's opinion.

28

Statements from the first category are more akin to statements of objective fact while the latter are more formal. (*Id.* at pp. 619-620.) The court concluded that the statements in the report the testifying expert relied upon were statements describing the physical condition of the body and were thus informal. (*Ibid*.)

The court also analyzed the issue of what the "primary purpose" of the autopsy was as it pertained to confrontation clause analyses. The court found the primary purpose of the autopsy was not to provide evidence for the police investigation. Even though a police detective was present, autopsies are routinely performed for various types of deaths other than suspected homicides and fulfill functions other than proffering evidence for police investigations, such as aiding in insurance investigations or simply satisfying curiosity regarding an unusual death. (*Dungo*, *supra*, 55 Cal.4th at p. 621.)

C. Analysis

With this legal history in mind, we now consider whether the opinions of Dr. Young's colleagues, which supported her conclusions, were testimonial. Because it had the concurrence of five justices, under the principle of stare decisis the holding and rationale of the court in *Lopez* are plainly binding on us. (See *Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455-456.) Under *Lopez*, the *unwritten* statements that Dr. Young's colleagues made to her, the substance of which she later conveyed to the jury, in no sense met the standard of formality and solemnity required by the court in *Lopez*. If anything, the *oral* statements in dispute here were less formal or solemn than the *written* notations in dispute in *Lopez*.

29

Moreover, under the principles set forth in Justice Corrigan's concurring opinion in *Lopez*, which was also supported by a majority of the court,[7] the remarks at issue here were not testimonial. As related by Dr. Young, her colleague's statements were made to her either in response to her request that they review her findings or in connection with a weekly review of the CAC's cases, which the CAC regularly conducts. In either case, it is clear from Dr. Young's testimony that her colleagues' opinions were not solicited for the purpose of presenting those opinions as evidence but only for the internal administrative purpose of validating Dr. Young's own conclusions. As such, they were not testimonial. (*Lopez*, *supra*, 55 Cal.4th at p. 590 (conc. opn. of Corrigan, J.).)

D. Prejudice

As our discussion of current confrontation clause jurisprudence indicates, this area of the law is developing and is not yet entirely settled. Thus, although under *Lopez* no violation of defendant's rights occurred, we nonetheless consider whether, if an error occurred, it was harmless.

Whenever the constitutional rights of a defendant are violated, the prosecution bears the burden of demonstrating beyond a reasonable doubt that the error did not contribute to the defendant's conviction. (*Chapman v. California* (1967) 386 U.S. 18, 24.) "The inquiry, in other words, is not whether, in a trial that occurred without the error, a guilty verdict would surely have been rendered, but whether the guilty verdict actually rendered in *this* trial was surely unattributable to the error." (*Sullivan v. Louisiana* (1993) 508 U.S. 275, 279.) "'''To say that an error did not contribute to the

---

[7] See footnote 6, *ante*.

30

ensuing verdict is . . . to find that error unimportant in relation to everything else the jury considered on the issue in question, as revealed in the record.' [Citation.] Thus, the focus is what the jury actually decided and whether the error might have tainted its decision."'" (*People v. Mercado* (2013) 216 Cal.App.4th 67, 91, quoting *People v. Pearson* (2013) 56 Cal.4th 393, 463.)

The alleged error in this case was unquestionably unimportant in light of the overall record at trial. Dr. Young's answer to the question regarding whether her colleagues agreed with her was a small part of her overall testimony and of the case against defendant. The direct examination of Dr. Young by the prosecutor runs for 47 pages in the trial transcript. The exchange between the prosecutor and Dr. Young regarding her colleagues' statements to her takes up less than a page. In closing argument, neither the prosecution nor defense counsel discussed Dr. Young's reference to her colleagues' opinions. Rather, as we have noted, in an apparent effort to establish credibility with the jury, at the beginning of her argument to the jury defendant's counsel conceded that defendant was guilty of molesting Jane and that his conduct was horrific.

Counsel's concession was warranted in light of the overwhelming evidence defendant molested Jane. Defendant confessed to law enforcement officers that he touched Jane's genitals on multiple occasions and to using a web camera to observe Jane in the nude. A police search of the house partially verified Jane's testimony by recovering both a web camera and two firearms that Jane testified to defendant possessing and threatening her with. Importantly, the text message from defendant to Jane, in which he announced his intent to force himself sexually upon her, was also entered into evidence.

31

Dr. Young's findings supported Jane's testimony that defendant had sexually penetrated her vagina, but it was merely circumstantial evidence as Dr. Young could not testify as to what exactly caused the injury or who caused it, only that the injury was a sign of sexual abuse. Dr. Young's testimony did support Jane's claim that defendant penetrated her vagina with his fingers, but it also supported her testimony that defendant raped her. The jury could not reach a verdict as to the rape charges, yet it convicted defendant of orally copulating and anally penetrating Jane even though the only evidence to support those charges was Jane's testimony and defendant had expressly denied committing those acts. In sum, given the entire record, testimony regarding the opinions of Dr. Young's colleagues was of little or any consequence to the final verdict.

### III

We also reject defendant's alternative argument that, in any event, Dr. Young's reference to her colleagues' confirmation of her conclusion was inadmissible hearsay. "The Evidence Code states that an expert witness may, on direct examination, provide the reasons for an opinion as well as the information upon which it is based, even if that information is inadmissible. (Evid. Code, §§ 801, subd. (b), 802.) In analyzing Evidence Code section 802, our Supreme Court has allowed an expert to testify about basis evidence consisting of out-of-court statements. In *People v. Catlin* (2001) 26 Cal.4th 81, 137, the court stated, '"[a]n expert may generally base his opinion on any 'matter' known to him, including hearsay not otherwise admissible . . . . [Citations.] On direct examination, the expert may explain the reasons for his opinions, including the matters he considered in forming them. . . ." [Citations.]' [Citations.] This basis evidence is

32

inadmissible, however, for its truth. [Citations.]" (*People v. Hill* (2011) 191 Cal.App.4th 1104, 1128.)

Admittedly, it is preferable that the trial court directly and expressly instruct the jury that such evidence is not offered for its truth. (See *People v. Williams* (2009) 170 Cal.App.4th 587, 622-623.) Here, the trial court, in ruling on defendant's objection, did implicitly refer to that limitation by noting that the opinions of Dr. Young's colleagues were admissible for the purpose of evaluating Dr. Young's opinion. In light of the fact that on their face her colleagues' opinions added nothing substantive to Dr. Young's own opinion, the trial court's description of them as a means of evaluating Dr. Young's testimony was self-evident and, in this particular context, sufficient to prevent the jury from considering them as substantive evidence admitted for its truth.

Moreover, any error in failing to more fully advise the jury as to the limited use of the evidence was, as we discussed with respect to the confrontation clause, harmless.

IV

Finally, defendant claims that his convictions on counts 21 and 22 arise from the same single incident and intent of touching Jane's vagina with his finger, and, thus, his sentence on either count 21 or count 22 should be stayed under section 654. We affirm defendant's consecutive sentences arising from his conviction on counts 21 and 22.

A. Additional Factual Background

In a videotaped interview with a police officer that was shown to the jury, Jane stated that the last time defendant abused her occurred when he picked her up from school, took her home and confronted her because he had discovered her aunt's business card in her room. When they got home, defendant grabbed Jane, took her into his

33

bedroom, forced her onto his bed and got on top of her. Defendant stuck his hand down the front of Jane's jeans and began rubbing her genitals. He questioned her as to whether she had told anyone about the molestations, and Jane replied that she had not. Jane tried to get away from him by "dropping down." In response, defendant threatened to rape or sodomize Jane with his penis and make it hurt if she did not stop resisting.

During the detective's questioning about this incident, the detective and Jane engaged in the following colloquy:

"[Detective]: Ok when stuck his hands down your pants and you said he touched your vagina, did he put any fingers in your vagina?

"[Jane]: (Nods head no)

"[Detective]: No, so when he put his hand down there what exactly did he do with his hand?

"[Jane]: He was rubbing."

At trial, Jane Doe testified as follows regarding the last time she was molested by defendant:

"A [Jane Doe] It was on a school day on a Thursday before he was arrested, on that Friday. And he picked me up and he took me to his bedroom again, and then he was -- he put his hands down my vagina and then he started rubbing it and he stuck his fingers in it and then after that --

"Q [prosecutor] He did stick his fingers in it on that time, the time right before you told?

"A Yes.

"Q And what did it feel like that time?

34

"A  It was painful.

"Q  And what else happened?

"A  And after that I was telling him to stop and then I was like trying to get his hands out.  So I was, like, dropped to the floor and then he was like if you don't quit it, I will take it out and stick it in and make sure it hurts.

"Q  Were you saying anything to him?

"A  I was yelling at him to stop."

The prosecution charged defendant with two counts related to the foregoing incident.  Count 21 charged defendant with committing sexual battery by restraint (§ 243.4, subd. (a)), and count 22 charged him with committing a lewd act upon a minor. (§ 288, subd. (c)(1)).

The jury convicted defendant on both charges, and defendant was sentenced to a consecutive term of two years for the sexual battery with restraint conviction and a consecutive term of one year four months for the lewd conduct conviction.

B.  Legal Principles

Under Section 654, a defendant may be convicted of multiple crimes arising from the same single act or indivisible transaction, but he or she may be punished only for one such act.  (*People v. Alvarez* (2009) 178 Cal.App.4th 999, 1006, citing *People v. Saffle* (1992) 4 Cal.App.4th 434, 438.)  The divisibility of a series of criminal acts is contingent on whether the acts were meant to serve a single objective or whether the criminal entertained multiple separate objectives.  (*People v. Alvarez*, *supra*, at p. 1006, citing *Neal v. State of California* (1960) 55 Cal.2d 11, 19.)

35

In cases of sexual assault, the courts have found a desire to obtain sexual gratification to be too broad to serve as a common objective when multiple sexual assaults are committed in close proximity to one another. (*People v. Perez* (1979) 23 Cal.3d 545, 552.) Assertion of a sole intent and objective to achieve sexual gratification is akin to an assertion of a desire for wealth as the sole intent and objective in committing a series of separate thefts. To accept that such a broad, overriding intent and objective precludes punishment for otherwise clearly separate offenses would violate the statute's purpose to insure that a defendant's punishment will be commensurate with his culpability. (*Ibid*.)

Thus, a defendant may be punished for multiple sexual assaults if "each offense was a separate and distinct act" and not merely incidental to or a necessary predicate to the other offenses. (*People v. Perez*, *supra*, 23 Cal.3d at p. 553.) For instance, acts of sodomy and rape committed in close sequence will count as separate punishable offenses because neither sex act is merely an incidental step to achieving the other act. On the other hand, removing a victim's clothes or applying lubricant to an area of the body to be copulated will not be punishable as separate crimes because these are simply necessary and incidental steps to raping the victim. (*People v. Alvarez*, *supra*, 178 Cal.App.4th at p. 1006.) Section 654 will not protect molesters from punishment when the "act is 'preparatory' only in the general sense that it may be intended to sexually arouse either the perpetrator or the victim." (*People v. Madera* (1991) 231 Cal.App.3d 845, 855.) "'It is defendant's intent and objective, not the temporal proximity of his offenses, which determine whether the transaction is indivisible.'" (*Ibid*.)

36

Importantly, whether multiple convictions were part of an indivisible transaction is primarily a question of fact. (*People v. Avalos* (1996) 47 Cal.App.4th 1569, 1583.) Thus, we review findings on divisibility in the light most favorable to the People and presume existence of every fact the trier could reasonably deduce from the evidence. (See *People v. Osband* (1996) 13 Cal.4th 622, 690, 730.)

C. Analysis

The record contains evidence that during the course of defendant's last molestation of Jane, although they were not separated by a lengthy period of time, two distinct acts were committed by defendant: (1) defendant put his hands down Jane's pants and rubbed her vagina, and (2) he then painfully stuck his finger in her vagina. Given this record, the question we must resolve is whether defendant's rubbing of Jane's vagina was merely incidental to penetrating Jane's vagina with his finger or a separate act with a separate objective.

Defendant of course had to touch Jane's outer genitalia to penetrate her vagina. However, Jane did not simply testify that defendant touched her vagina before sticking his fingers inside her. Jane testified that defendant rubbed her vagina. Her statement that defendant rubbed her vagina indicates that he was moving his fingers back and forth over the surface of Jane's outer genitalia, caressing or massaging it, without any penetration. Such gratuitous touching would not be necessary to accomplish the task of penetrating Jane vaginally with a finger. In light of the questions defendant was asking Jane during the assault and Jane's effort to stop the assault, a finder of fact could reasonably infer that defendant initially rubbed Jane's outer genitals to either sexually arouse Jane or himself and that the later digital penetration was separate from any arousal and was intended to

37

hurt and punish Jane because defendant was not satisfied with her responses to his questions. (See, e.g., *People v. Jimenez* (2002) 99 Cal.App.4th 450, 456-457 [separate convictions supported by evidence of touching genitals followed by evidence of penetration].)

Because the two acts defendant committed support a finding that the first was not simply incidental to the second, they both were properly punished.

DISPOSITION

Defendant's convictions as to counts 4, 5, 6 and 20 are reversed with directions that on remand the trial court, after considering any arguments of the parties, dismiss one of those counts and sentence defendant on the remaining three counts and enter judgment accordingly. In all other respects, the judgment of conviction is affirmed.


BENKE, Acting P. J.

WE CONCUR:


McDONALD, J.


IRION, J.